**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**WESTERN DIVISION**

| | | |
|---|---|---|
| MARSHAUN BOYKIN (#R-54017), | ) | |
| | ) | |
| Plaintiff, | ) | No. 16 CV 50161 |
| | ) | |
| v. | ) | |
| | ) | Judge Thomas M. Durkin |
| DR. JAMIE CHESS and | ) | |
| WEXFORD HEALTH SOURCES, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

## I.     Introduction

Plaintiff Marshaun Boykin, an Illinois state prisoner, has brought this currently *pro se* civil rights action pursuant to 42 U.S.C. § 1983.   Plaintiff claims that Defendant Jamie Chess, a psychologist at the Dixon Correctional Center (as well as Wexford Health Sources, the corporation that once employed her), violated Plaintiff's constitutional rights by acting with deliberate indifference to his mental health needs and by wrongfully authorizing his punishment for acts of self-harm he commits on account of his mental illness.   All other Defendants were previously dismissed by amendment or through settlement.   Currently before the Court is Defendants' motion for summary judgment.   R. 100. For the reasons set forth below, the motion is granted.

## II.     Plaintiff's *Pro Se* Status

The Court notes at the outset that it normally would have recruited counsel in litigation involving mental health treatment.   Indeed, *pro bono* counsel represented

Plaintiff in this matter from the Court's Section 1915A initial review until August 2018. However, as occurred in many of Plaintiff's lawsuits in this district, counsel ultimately withdrew from the case due to clashes with him. *See* R. 66, Minute Entry of August 1, 2018 (Johnston, J.). The attorneys assigned to represent Plaintiff sought leave to withdraw on the basis of "irreconcilable differences" that made it "impossible" for counsel to continue assisting Plaintiff. (R. 64, Motion to Withdraw, at ¶ 3.) Lead counsel recounted that even though she had devoted over a hundred hours to working in Plaintiff's interests, and that law firm associates had also contributed a substantial amount of time and energy to the case, Plaintiff had become progressively more "aggressive, demanding, insulting, and belligerent" toward his legal team. (*Id.*, ¶¶ 4, 8.)

The magistrate judge previously assigned to this case declined to recruit new counsel. (R. 66; *see also* R. 70, Minute Entry of August 16, 2018 (Johnston, J.)). The undersigned judge likewise denied Plaintiff's multiple renewed requests for attorney representation. (R. 97, Order of September 4, 2019; R. 113, Order of October 22, 2019; R. 115, Order of November 1, 2019.) The Court cited Plaintiff's history in this case, orders addressing counsel requests in other cases, Plaintiff's pattern of conflict with recruited *pro bono* counsel, the fact that his attorneys had already marshalled the evidence for him prior to their withdrawal from this matter, and his ability to litigate forty-two lawsuits in this district with a high degree of success as factors weighing against enlisting new counsel at the summary judgment stage of these

proceedings.   (R. 97.)

The Court was, and remains, satisfied that Plaintiff was capable of navigating this matter on his own, notwithstanding his mental illness.   *See, e.g., Romanelli v. Suliene*, 615 F.3d at 847, 849 (7th Cir. 2010) (quoting with approval the district court's assessment that the "whole point" of psychotropic drugs is to allow the person taking the medication to think and act rationally); *see also Boykin v. KSB Hospital*, Case No. 18 CV 50371, R. 4, Order of December 10, 2018, at p. 3 (Kapala, J.) (observing that Plaintiff seemed to allude to his mental health issues only when it suited him); *Boykin v. Dixon Mental Health Services*, Case No. 16 CV 50160, R. 180, Memorandum Opinion and Order of November 18, 2018, at pgs. 1-3 (Durkin, J.) (discussing the reasons Plaintiff was proceeding *pro se* at summary judgment). Plaintiff has shown himself to be highly intelligent and an adequate litigator.

## III.   **Legal Standard**

"The court shall grant summary judgment if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to a judgment as a matter of law."   Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Hanover Ins. Co. v. Northern Bldg. Co.*, 751 F.3d 788, 791 (7th Cir. 2014).   In determining whether factual issues exist, the Court must view all the evidence and draw all reasonable inferences in the light most favorable to the non-moving party. *Weber v. Univ. Research Assoc., Inc.*, 621 F.3d 589, 592 (7th Cir. 2010).   The Court does not "judge the credibility of the witnesses, evaluate the weight of the evidence,

or determine the truth of the matter. The only question is whether there is a genuine issue of fact." *Gonzalez v. City of Elgin*, 578 F.3d 526, 529 (7th Cir. 2009) (citing *Anderson v. Liberty Lobby*, 477 U.S. 242, 249-50 (1986)).

To survive summary judgment, the nonmoving party must make a sufficient showing of evidence for each essential element of his case on which he bears the burden at trial. *Blow v. Bijora, Inc.*, 855 F.3d 793, 797-98 (7th Cir. 2017) (citing *Celotex*, 477 U.S. at 322-23). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Blythe Holdings, Inc. v. DeAngelis*, 750 F.3d 653, 656 (7th Cir. 2014) (citations omitted). "A genuine issue of material fact arises only if sufficient evidence favoring the nonmoving party exists to permit a jury to return a verdict for that party." *Johnson v. Manitowoc Cty.*, 635 F.3d 331, 334 (7th Cir. 2011) (quoting *Faas v. Sears, Roebuck & Co.*, 532 F.3d 633, 640-41 (7th Cir. 2008)).

## IV.    Local Rule 56.1

Local Rule 56.1 (N.D. Ill.) governs the procedures for filing and responding to motions for summary judgment in this judicial district. "Under the Local Rules of the Northern District of Illinois, a party filing a motion for summary judgment under Federal Rule of Civil Procedure 56 must serve and file "a statement of material facts as to which the moving party contends there is no genuine issue and that entitle the moving party to a judgment as a matter of law." N.D. Ill. L.R. 56.1(a)(3). The opposing party must then file "a response to each numbered paragraph in the moving

party's statement, *including, in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon.*" N.D. Ill. L.R. 56.1(b)(3)(B)). The opposing party may also present a separate statement of additional facts that require the denial of summary judgment. *See Ciomber v. Coop. Plus, Inc.*, 527 F.3d 635, 643-44 (7th Cir. 2008). A plaintiff's *pro se* status does not excuse him from complying with these rules. *Morrow v. Donahoe*, 564 F. App'x 859, 860 (7th Cir. 2014) (unpublished opinion) (citing *Pearle Vision, Inc. v. Romm,* 541 F.3d 751, 758 (7th Cir. 2008) (inter alia)).

Consistent with the Local Rules, Defendants filed a Statement of Material Facts along with their motion for summary judgment. (R. 102, Defendants' Local Rule 56.1(a) Statement.) Each substantive assertion of fact in Defendants' Local Rule 56.1(a)(3) Statement is supported by evidentiary material in the record. Also in accordance with the Local Rules, Defendants filed and served on Plaintiff a Local Rule 56.2 Notice, which explained in detail the requirements of Local Rule 56.1. (R. 105, "Notice to *Pro Se* Litigant Opposing Motion for Summary Judgment.") The notice warned Plaintiff that a party's failure to controvert the facts as set forth in the moving party's statement results in those facts being deemed admitted. *See also Apex Digital, Inc. v. Sears, Roebuck & Co.*, 735 F.3d 962, 965 (7th Cir. 2013); *Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003).

Despite those instructions and admonitions, Plaintiff has submitted multiple responses to Defendants' Statement of Material Facts that are impermissible blends

of unsupported facts, legal arguments, and legal conclusions. Legal assertions and legal conclusions are improper in a statement of facts. *See, e.g., Judson Atkinson Candies,* 529 F.3d at 382 n.2 ("It is inappropriate to make legal arguments in a Rule 56.1 statement of facts."); *Tarkov v. Frontier Airlines, Inc.,* 2018 WL 4183209, at *2 (N.D. Ill. Aug. 31, 2018) (same) (citation omitted); *see also Almy v. Kickert Sch. Bus Line, Inc.,* 2013 WL 80367, at *2 (N.D. Ill. Jan. 7, 2013) ("[C]ourts are not required to 'wade through improper denials and legal arguments in search of a genuinely disputed fact'") (citation omitted).

Furthermore, Plaintiff fails to cite to the evidentiary record for almost all of the factual assertions he makes. *See Winters v. Fru-Con Inc.,* 498 F.3d 734, 744 (7th Cir. 2007) ("In considering a motion for summary judgment, the district court is not required to scour the record in search of evidence to defeat the motion; the nonmoving party must identify with reasonable particularity the evidence upon which the party relies"). At the summary judgment stage of a proceeding, a plaintiff must "put up or shut up" and "show what evidence [he] has that would convince a trier of fact to accept [his] version of events." *Olendzki v. Rossi*, 765 F.3d 742, 749 (7th Cir. 2014) (quoting *Steen v. Myers,* 486 F.3d 1017, 1022 (7th Cir. 2007).

Moreover, with regard to Plaintiff's numerous statements that "I do not remember this event" (*see, e.g.*, Pltff. Resp. to Defts. SOF, ¶¶ 17, 39), and "I do not recall this event" (*id.*, ¶¶ 16, 24, 25, 26, 43, 45-52, 55-57), "[a] witness's inability to recall something will not create a fact issue in the face of affirmative evidence of the

fact." *Kaepplinger v. Michelotti*, 2019 WL 3024633, at *4 n.7 (N.D. Ill. July 9, 2019) (collecting cases); *Tokowitz v. Cook Cty. Sheriff's Office*, 2012 WL 3987463, at *1 (N.D. Ill. Sept. 7, 2012) (same).

But a non-movant's failure to comply with Local Rule 56.1 does not automatically result in judgment for the movant. *Keeton,* 667 F.3d at 884; *Love v. Rockford Illinois Mun. Police Dep't*, 2013 WL 159246, at *1 (N.D. Ill. Jan. 15, 2013). The movant must still demonstrate that it is entitled to judgment as a matter of law. *Keeton,* 667 F.3d at 884; *Love*, 2013 WL 159246, at *1. And the Court still views all the facts asserted by the moving party in the light most favorable to the non-moving party, drawing all reasonable inferences in the non-movant's favor. *Keeton,* 667 F.3d at 884; *Love*, 2013 WL 159246, at *1.

Because Plaintiff is once again proceeding *pro se*, the Court has interpreted his responses generously, considered his series of responses to Defendants' summary judgment motion, and construed his multiple statements of additional facts as favorably as the record and Local Rule 56.1 permit. *See Thomas v. Williams*, 822 F.3d 378, 385 (7th Cir. 2016). The Court has also taken into account Plaintiff's unsupported factual assertions to the extent that he could properly testify about the factual matters asserted, and those facts have bearing on the Court's analysis. *See* Fed. R. Evid. 602 (testimony must be based on personal knowledge); Fed. R. Evid. 702 (prerequisites for testimony by expert witnesses); Fed. R. Civ. P. 56(c)(4) (affidavits or declarations in support of or opposition to a motion must be based on

personal knowledge, and must set out facts that would be admissible in evidence); *Han v. Whole Foods Mkt. Grp., Inc.*, 44 F. Supp. 3d 769, 793 (N.D. Ill. 2014) (a witness generally may not testify about another person's state of mind) (citation omitted).

Nevertheless, Plaintiff, a layperson, is not competent to refute professional medical testimony. *See, e.g., Arnold v. Barnhart*, 473 F.3d 816, 822 (7th Cir. 2007) (administrative law judge in SSI case properly based his disability decision on the opinions of a medical doctor and attributed "limited significance" to the testimony of plaintiff's neighbors, some of whom had experience with brain-injured people, but none of whom were medical professionals); *High v. Oberhelman*, 2000 WL 705994, at *9 (N.D. Ill. May 19, 2000) (*pro se* prisoner was not qualified either to testify that he had a serious medical condition or to contradict the judgment of medical doctors that further tests were in order).

That said, the parties' respective versions of the events underlying this action diverge only slightly. The Court notes the minor discrepancies below, and has otherwise incorporated Plaintiff's additional facts into this opinion. The Court finds that the following facts, all supported by the record, are undisputed for purposes of the summary judgment motion, or that there is no issue of fact that might affect the outcome of this case (*see* fn. 1):

## V.     Uncontested Facts

Plaintiff Marshaun Boykin (incarcerated under the surname "Boykins") is an Illinois state prisoner.  (R. 102, Defendants' Local Rule 56.1(a) Statement of Material

Facts, ¶ 1.) Plaintiff is presently incarcerated at the Dixon Correctional Center. (*Id.*)

From July 2008 until May 2015, Defendant Jamie Chess, a psychologist, was the Director of Mental Health Services at Dixon. (*Id.*, ¶ 4.) Since May 2015, Dr. Chess has been Dixon's Public Service Administrator and Psychologist Administrator.[1] (*Id.*) In her role as a staff psychologist, Dr. Chess provides mental health treatment to Dixon inmates, in conjunction with other members of the mental health staff, including psychiatrists and other behavioral staff members. (*Id.*)

Wexford Health Sources, Inc., has a contract with the State of Illinois to provide medical care and treatment to state prisoners. (*Id.* ¶ 5.) Wexford employed Dr. Chess until she became a prison administrator. (*Id.*, ¶ 4.)

## A. Plaintiff's Placement in Dixon's Special Treatment Center

Mental health professionals have diagnosed Plaintiff as seriously mentally ill. (*Id.*, ¶ 2.) He suffers from various psychiatric conditions, including major depression, mood disorder, and borderline personality disorder. (*Id.*) Plaintiff has

---

[1] Plaintiff offers no evidence to support his contention that Chess "was terminated from being [an] employee by Wexford Health Sources in May of 2015 due to multiple complaints being filed against her ... for acting with deliberate indifference toward the Plaintiff...." (R. 116, Plaintiff's Statement of Additional Facts, ¶ 3.) Defendants call that statement "impertinent, immaterial, scandalous, and without a basis in reality." (R. 129, Defendants' Response to Plaintiff's Statement of Facts, ¶ 3.) A court may grant summary judgment if facts are in dispute, so long as those facts are not outcome determinative. *See, e.g., Montgomery v. Am. Airlines, Inc.,* 626 F.3d 382, 389 (7th Cir. 2010); *Gurley v. Johnson*, 2015 WL 4148668, at *3, n.1 (N.D. Ill. July 8, 2015) (same). Consequently, a jury need not decide whether Wexford fired Dr. Chess, as Plaintiff maintains, or Dr. Chess applied for, and was promoted to, a new position, as she maintains.

a history of suicide attempts. (*Id.*) Plaintiff's general mental health treatment includes being prescribed various antidepressants and psychotropic medications. (*Id.*, ¶ 3.) Plaintiff also routinely sees a psychiatrist, a psychologist, and myriad behavioral health technicians for one-on-one therapy sessions and counseling. (*Id.*) Plaintiff has been housed in a residential treatment center ever since his admission to IDOC custody in September 2012. (*Id.*) Residential treatment centers are specifically dedicated to providing mental health treatment to seriously mentally ill prisoners. (*Id.*)

Dr. Chess participated in a placement review for Plaintiff in November 2013. (*Id.*, ¶ 49.) As part of the evaluation process, Dr. Chess met with Plaintiff and reviewed his mental health records. (*Id.*) Dr. Chess also consulted with Dixon's then-psychologist administrator, Plaintiff's treating psychiatrist, the superintendent of the Special Treatment Center, and fellow members of the IDOC's Admission Review Committee. (*Id.*) After considering all the relevant criteria, Dr. Chess formed the opinion[2] that the most appropriate housing for Plaintiff was Dixon's

---

[2] Throughout her affidavit, Dr. Chess is careful to state that she merely "recommended" certain actions with respect to Plaintiff's prison assignment (R. 102, Defts. SOF, ¶ ¶ 49-55), and that "it was determined" (presumably, by prison administrators) where Plaintiff should be housed. (*Id.*) Plaintiff is not competent to contradict Dr. Chess. Dr. Chess also clarifies that only psychiatrists can prescribe medications. (R. 129, Defts. Response to Pltff. SOF, ¶ 6.) Plaintiff misunderstands Dr. Chess's function at the prison when he declares that she withheld medication (R. 125, Pltff. Resp. to Defts. SOF, ¶¶ 58, 59), and that she "had (and still has) the authority to order medication and approve transfers to a specialized treatment facility...." (R. 116, Pltff. Statement of Additional Facts, ¶ 2; *see also* ¶ 14 ("she has the authority to transfer inmates")).

Special Treatment Center, which offers specialized mental health care services for those in need of it. (*Id.*, ¶¶ 49, 51.)

The Admission Review Committee slated a 6-month review of Plaintiff's placement at the Special Treatment Center. (*Id.*, ¶ 49.)

On February 13, 2014, Dr. Chess conducted another placement review for Plaintiff. (*Id.*, ¶ 50.) Dr. Chess again met with Plaintiff, reviewed his medical charts, and conferred with her colleagues before recommending that Plaintiff remain in the Special Treatment Center. (*Id.*)

During the August 2014 placement review process, Dr. Chess and the Admission Review Committee determined that Plaintiff was stable enough for a transfer to the Western Illinois Correctional Center. (*Id.*, ¶ 52.) However, the anticipated transfer was not completed. (*Id.*) Because Plaintiff refused to comply with his treatment plan, prison employees decided that he needed to remain at the Special Treatment Center. (*Id.*)

## B. Alleged Suicide Attempt in August 2014

Beginning in late July or early August, Plaintiff went without his medications on several instances. (*Id.*, ¶ 7.) According to Plaintiff's medical charts, he refused his medications. (*Id.*). Plaintiff, however, maintains that nurses would walk past his cell without dispensing his medication. (Plaintiff's Response to Defendants' Statement of Facts, ¶ 7.) Plaintiff notes that he signed no medication refusal forms on those dates. (*Id.*)

On August 7, 2014, Plaintiff received a disciplinary ticket for misuse of a bed sheet and for possession of contraband. (*Id.*, ¶ 6.) Incident reports say that Plaintiff wrapped a bed sheet around his neck in order to hang himself from an air vent. (*Id.*) The prison staff managed to tear the sheet down. (*Id.*)

The parties disagree whether a registered nurse and nurse practitioner, respectively, attended to Plaintiff immediately after the incident and again later that afternoon. (*Id.*, ¶ 9; Plaintiff's Response, ¶ 9.)

One of the prison's clinical psychologists, Dr. Humphrey (who is not a Defendant in this lawsuit), placed Plaintiff on a 10-minute suicide watch. (*Id.*, Defts. SOF, ¶ 8.) Dr. Humphrey also ordered that Plaintiff be placed in therapeutic restraints for four hours. (*Id.*)

On August 21, 2014, Plaintiff attended a hearing on the above-described disciplinary report. (*Id.*, ¶ 11.) The hearing officers contacted the facility's Therapeutic Services Department,[3] which provided its assessment that Plaintiff's mental health conditions "did not factor" into his actions. (*Id.*) Therapeutic Services thus concluded that there were no mitigating factors that diminished Plaintiff's personal responsibility. (*Id.*)

The prison Adjustment Committee found plaintiff guilty of damage to or misuse of prison property. (*Id.*, ¶ 12.) The Committee sentenced him to 10 days in segregation and a one-month demotion to "C-grade." (*Id.*)

---

3 The record does not support Plaintiff's contention that "Dr. Chess *is* Therapeutic Services." (Pltff. Resp. to Defts. SOF, ¶ 11.)

Dr. Chess was not involved in the disciplinary proceedings. (*Id.*, ¶ 11.) Dr. Chess does not have any authority to decide guilt, to administer discipline to prisoners, or to place them in segregation.[4] (*Id.*, ¶¶ 11, 12.)

Plaintiff's medical records for "segregation sick call" reflect that a nurse visited him every day in August 2014, but that he refused treatment. (*Id.*, ¶ 13.) Plaintiff was still prescribed psychiatric mediations at that time. (*Id.*)

## C. Plaintiff's Transfer to Dixon's Psychiatric Unit

Plaintiff underwent placement review again in April 2015. (*Id.*, ¶ 53.) Due to a new, 70-year sentence, Plaintiff was re-classified as a maximum security inmate under IDOC guidelines. (*Id.*) Because IDOC rules do not permit maximum security inmates to be housed at the Special Treatment Center,[5] Plaintiff was transferred to Dixon's Psychiatric Unit. (*Id.*) Dr. Chess and the Admission Review Committee agreed that Plaintiff's placement at the Psychiatric Unit was

---

4 Plaintiff is not competent to testify otherwise. Plaintiff argues that Dr. Chess "has the authority to [embroil herself in prisoner disciplinary proceedings], and everything dealing with mental health goes through her, she has to sanction everything concerning mentally ill inmates." (R. 116, Pltff. Resp. to Defts. SOF, ¶ 11.) But Plaintiff's contention is insufficient to call into question Dr. Chess's sworn affidavit to the contrary.

5 Again, Plaintiff provides no evidence to support his belief that "there must be some type of behavior[al] issues" before a transfer from the Special Treatment Center to the Dixon Psychiatric Unit can take place. (R. 116, ¶ 7.) Nor has Plaintiff substantiated his claim that Dr. Chess had authority over, or involvement in, his maximum security classification. Plaintiff's unfounded suspicions do not support a finding that Dr. Chess somehow "upgraded" his security classification. (*Id.*, ¶¶ 11, 14.)

appropriate.  (*Id.*)

Like the Special Treatment Center, Dixon's Psychiatric Unit is a residential treatment unit.  (*Id.*, ¶¶ 3, 53.)  The Psychiatric Unit is dedicated to providing mental health treatment to maximum security inmates who have been diagnosed as seriously mentally ill.  (*Id.*, ¶ 53.)

Dr. Chess performed another placement review in August 2015.  (*Id.*, ¶ 55.)  After reviewing Plaintiff's situation, Dr. Chess did not recommend a transfer to another unit or prison.  (*Id.*)  Dr. Chess made the same recommendation during another placement review later that month.  (*Id.*, ¶ 56.)

### D.  October 2015 Alleged Suicide Attempt

In October 2015, Plaintiff had prescriptions for Wellbutrin, Gabapentin, Prozac, Trazodone, and Ibuprofen.  (*Id.*, ¶ 14.)  But in the days leading up to October 14, 2015, Plaintiff refused his prescribed psychotropic medications. (*Id.*)  Plaintiff was angry because his psychiatrist (Dr. Fischer, a Defendant in a separate lawsuit) had ordered his Wellbutrin to be dispensed crushed instead of in pill form.  (*Id.*)  That order came about because Plaintiff had been caught "cheeking" (that is, hiding in his mouth instead of swallowing) and hoarding his Wellbutrin pills.  (*Id.*)

On October 14, 2015, Plaintiff attempted to hang himself by tying a bed sheet to the bottom railing of an upper deck in his housing tier.  (*Id.*, ¶ 15.)  Plaintiff was examined at the scene and treated for injuries to his neck.  (*Id.*)  He was then transported to the health care unit for further assessment and treatment.  (*Id.*)  A

nurse practitioner and the prison's medical director performed the evaluation. (*Id.*) They found no marks on Plaintiff's lungs, determined that his lungs were clear, and detected no evidence of trauma to his head. (*Id.*) "[M]ultiple" members of Dixon's medical and mental health care staff saw Plaintiff following his ostensible suicide attempt. (*Id.*)

Plaintiff received a disciplinary ticket the same day. (*Id.*, ¶ 17.) The disciplinary report charged him with violating health and safety regulations. (*Id.*)

The next day, Plaintiff was discharged from the infirmary and sent back to the Psychiatric Unit. (*Id.*, ¶ 18.) His assigned psychologist met with him. (*Id.*)

On October 16, 2015, Plaintiff had an appointment with his psychiatrist, Dr. Fischer, who prescribed Neurontin, Wellbutrin, Prozac, Trazodone, and Clonazepam. (*Id.*, ¶ 19.)

Later that day, a Dr. Gonzalez (who is not a named Defendant) conducted a mental health assessment in connection with the aforementioned disciplinary report. (*Id.*, ¶ 20.) After interviewing Plaintiff, Dr. Gonzalez concluded that Plaintiff's mental illness did not contribute to his suicide attempt. (*Id.*) Dr. Gonzalez pronounced that Plaintiff's placement in segregation was appropriate based on his mental health symptoms and needs.

On October 18, 2015, Plaintiff's psychologist (non-Defendant Dr. Elaine Bochenek) met with him during her rounds. (*Id.*, ¶ 21.)

On October 22, 2015, Plaintiff appeared before a prison adjustment committee

for a hearing on the disciplinary ticket. (*Id.*, ¶ 22.) The adjustment committee contacted the facility's Therapeutic Services Department for its input. (*Id.*) Therapeutic Services reported that Plaintiff's mental health conditions "did not factor into his actions," and that there were no mitigating circumstances that the adjustment committee needed to consider. (*Id.*)

After weighing the evidence, the adjustment committee found Plaintiff guilty of the health and safety violation. (*Id.*, ¶ 23.) The committee imposed a sentence of 10 days in segregation and a 2-month demotion to C-grade status. (*Id.*) Dr. Chess had no involvement whatsoever in the disciplinary proceedings. (*Id.*, ¶¶ 22, 23.)

Dr. Bochenek checked on Plaintiff that same day. (*Id.*, ¶ 24.) She confirmed that the mental health staff was visiting Plaintiff at least 2-3 times per week following his purported suicide attempt. (*Id.*)

On October 30, 2015, Dr. Fischer evaluated Plaintiff for "suicide potential." (*Id.*, ¶ 25.) Dr. Fischer determined that Plaintiff no longer needed to be on crisis watch, and that he could be returned to his residential treatment unit. (*Id.*)

### E. March 2016 Placement Review

In March 2016, Dr. Chess once again participated in a placement review for Plaintiff. (*Id.*, ¶ 57.) After reviewing Plaintiff's mental health records and discussing his case with other members of the Admission Review Committee, Dr. Chess concluded that Plaintiff's placement in Dixon's Psychiatric Unit remained

appropriate. (*Id.*) Plaintiff was scheduled for his regular, 6-month review. (*Id.*)

## F. April 2016 Suicide Threat

About six months later, in April 2016, Plaintiff had active prescriptions for Gabapentin, Prozac, Trazodone, and Ativan to control his mental health issues. (*Id.*, ¶ 26.) But on April 8, 2016, Plaintiff refused his antidepressant, antipsychotic and pain medications. (*Id.*)

That day, prison employee Jose Hernandez (a non-Defendant) issued Plaintiff a disciplinary ticket charging him with threats, insolence, or intimidation. (*Id.*, ¶ 26.) According to the disciplinary report, Plaintiff threatened to hurt himself by jumping off the gallery if he did not receive certain items of his property back. (*Id.*) Plaintiff insisted on speaking to a member of Dixon's crisis team, but he refused to talk to Mr. Hernandez. (*Id.*) Mr. Hernandez is a member of the prison crisis team. (*Id.*)

On April 11, 2016, a mental health provider named Ms. Carlson (another non-Defendant) completed a mental health disciplinary review. (*Id.*, ¶ 28.) Carlson noted that Plaintiff was not on crisis watch at the time of the incident, and further found that Plaintiff's mental illness was not a contributing factor in his conduct giving rise to the disciplinary ticket. (*Id.*) Carlson concluded that Plaintiff's placement in segregation would be appropriate for his symptoms and needs. (*Id.*)

On April 14, 2016, Plaintiff had a hearing on his disciplinary ticket. (*Id.*, ¶ 29) The adjustment committee contacted the Therapeutic Services Department and

received word that Plaintiff's mental health conditions had not factored into his actions. (*Id.*) The adjustment committee found Plaintiff guilty of insolence and intimidation. (*Id.*) Plaintiff was given a verbal reprimand. (*Id.*) Defendant Chess was not involved in the disciplinary hearing and was not even aware of the incident prior to this lawsuit. (*Id.*, ¶ 30.)

### G. May 2016 Crisis Watch and Disciplinary Action

On May 11, 2016, Plaintiff received a disciplinary report charging him with staff assault and disobeying a direct order. (*Id.*, ¶ 31.) The officer who issued the ticket reported that he had attempted to escort Plaintiff to his cell, but that Plaintiff refused commands to enter his cell. (*Id.*) Plaintiff stood accused of becoming aggressive and trying to kick the officer. (*Id.*) Plaintiff is adamant that it was the correctional officers who engaged in unjustified force. (Pltff. Resp. to Defts. SOF, ¶ 11.)

A mental health provider (Weigand, who is not a Defendant in this action) paid Plaintiff a visit that afternoon. (Defts. SOF, ¶ 32.) Weigand found Plaintiff sitting on the floor of his cell cutting his arm on the bottom of his cell's metal bed. (*Id.*) Plaintiff was tearful and lamenting that he had "nothing to live for anymore." (*Id.*) Plaintiff refused to stop hurting himself. (*Id.*) Weigand ordered a 10-minute suicide watch and dictated that Plaintiff be furnished only with a smock to wear. (*Id.*)

While on crisis watch, Plaintiff was reported to be hitting his head on the floor[6] and continuing to scrape his wrist underneath his bed. (*Id.*, ¶ 33.) The correctional staff contacted a nurse, who went to Plaintiff's cell to see whether he needed medical treatment. (*Id.*, ¶ 34.) The nurse noted that Plaintiff had a superficial scratch on his wrist and some redness and swelling of his cheek. (*Id.*) Plaintiff's breathing was unlabored. (*Id.*) Plaintiff refused to answer any questions about his medical condition. (*Id.*) The nurse cleaned and dressed Plaintiff's wound. (*Id.*) "Neuro checks" were ordered every four hours. (*Id.*) Per the instructions of the mental health care staff, Plaintiff remained on a 10-minute watch. (*Id.*)

Defendants state that Plaintiff refused to cooperate with initial neuro checks the medical staff attempted. (*Id.*, ¶ 35.) Plaintiff denies that any neuro checks were conducted. (Pltff. Resp. to Defts. SOF, ¶ 37.)

On the evening of May 11, 2016, correctional officers had to resort to carrying Plaintiff to his cell after he became defiant and refused to return to his cell of his own volition. (*Id.*, ¶ 39.) Plaintiff managed to intentionally hit his head as he was being carried. (*Id.*) Once in his cell, Plaintiff attempted to cut his wrist. (*Id.*)

The following morning, Plaintiff tried to "take[] his chuckhole hostage." (*Id.*) Prison employees had to restrain Plaintiff to prevent him from following through on

---

6 Plaintiff denies that he was hitting his head on the floor. He maintains that the nurse who reported him doing so was trying to cover up for correctional officers who had assaulted him. (Pltff. Resp. to Defts. SOF, ¶ 33.) But whether or not Plaintiff was actually hitting his head, there is no dispute that the nurse reported him to be doing so.

his threats of self-harm. (*Id.*) Plaintiff refused treatment for his wounds, and also rebuffed another attempted neuro check. (*Id.*, ¶¶ 38, 39.) Therefore, psychiatrist Ramon Marquez (who is not a Defendant) ordered the emergency involuntary administration of psychotropic medications, including Haldol, Benadryl, and Ativan for three days. (*Id.*, ¶ 39.)

A mental health provider (Hagler, who is not a Defendant) conducted a mental health disciplinary review later that day. (*Id.*, ¶ 40.) Hagler concluded that Plaintiff was responsible for his actions and that punishment was appropriate. (*Id.*)

On May 14, 2016, Plaintiff was seen by another mental health provider. (*Id.*, ¶ 42.) At that time, Plaintiff was taking only his enforced medications. (*Id.*) Plaintiff was refusing to take his regularly prescribed medications. (*Id.*) Plaintiff indicated that he was ready to be taken off watch status and that he wanted his personal property back. (*Id.*, ¶ 31.) The mental health provider noted that Plaintiff's thought process was coherent, and that he did not have any suicidal or homicidal ideations. (*Id.*) Even though Plaintiff's condition seemed to be continuing to stabilize, the mental health provider decided to continue Plaintiff's 15-minute crisis watch for the time-being. (*Id.*) The staff member ordered that Plaintiff could have his blanket, smock, and a mattress, as the inmate complained that the observation cell was "freezing cold." (*Id.*; Pltff. Resp. to Defts. SOF, ¶ 41.)

The next day, Plaintiff had a follow-up appointment with another mental health provider, William (who is not a party to this lawsuit). (Defts. SOF, ¶ 42.)

Plaintiff was still on a 15-minute crisis watch at that time, but asked to be taken off observation status. (*Id.*) Plaintiff said that he was feeling better, and he reported no further incidents of self-harm. (*Id.*) Williams noted that Plaintiff was alert, cooperative, oriented, and had a clear thought process. (*Id.*) Williams contacted Defendant Chess to discuss Plaintiff's status. (*Id.*) The two changed Plaintiff's crisis watch to 30-minute intervals. (*Id.*)

On May 17, 2016, Plaintiff was taken off of crisis watch. (*Id.*, ¶ 43.) The prison's mental health care staff continued to see him "regularly" while he remained in segregation. (*Id.*)

On May 19, 2016, Plaintiff attended an Adjustment Committee hearing stemming from the events of May 11th. (*Id.*, ¶ 44.) The hearing officers contacted Therapeutic Services. (*Id.*) Therapeutic Services indicated that Plaintiff's mental health conditions did not factor into his actions. (*Id.*) The Adjustment Committee found Plaintiff guilty of assault and disobeying a direct order. (*Id.*) He was punished with a two-month demotion to C-grade status, one month in segregation, loss of segregation yard privileges for one month, and a six-month restriction on contacts with outside visitors. (*Id.*) Dr. Chess was not involved in that disciplinary hearing. (*Id.*)

On May 20, 2016, Dr. Bochenek performed an evaluation to assess Plaintiff's suicide risk. (*Id.*, ¶ 45.) Dr. Bochenek noted in Plaintiff's medical chart that he refused to cooperate in the evaluation. (*Id.*) Nevertheless, Dr. Bochenek

determined that Plaintiff did not need to be on crisis status. (*Id.*) She recommended that he remain in segregation housing. (*Id.*)

Dr. Bochenek screened Plaintiff for suicide potential again the next morning. (*Id.*, ¶ 46.) At that time, she decided that he should be placed on suicide watch, checked every 10 minutes, and be placed in "crisis care." (*Id.*) The mental health staff saw Plaintiff during their regular rounds while he remained on watch status. (*Id.*, ¶ 47.)

Although Plaintiff once again refused to work with Dr. Bochenek during an evaluation on May 26, 2016, she believed that he did not need to be on crisis watch any longer. (*Id.*, ¶ 42.)

## H. Chess Affidavit

Dr. Chess has submitted an affidavit attesting that she never ignored Plaintiff's complaints concerning his mental health, never refused to treat his mental health conditions, and never withheld medically necessary treatment. (Defts. SOF, ¶ 58; *see also* R. 102-5, Defendants' Exhibit 2, Declaration of Jamie Chess, ¶ 56.) Dr. Chess additionally states that she never intentionally caused Plaintiff any physical or emotional harm in treating or interacting with him. (Defts. SOF, ¶ 59; Chess Affid., ¶ 57.)

## I. Plaintiff's Additional Facts

Plaintiff has filed and appealed numerous grievances concerning his alleged "suffering" at the Dixon Correctional Center. (R. 117, Plaintiff's Statement of

Additional Facts, ¶ 4.) He has also filed many lawsuits against Dixon correctional officials and health care providers since 2014. (*Id.*)

According to Plaintiff, at least eight inmates under Dr. Chess's care have committed suicide in recent years. (R. 116, Plaintiff's "Additional Statements of Material Facts," ¶ 9.)

## VI. Analysis

No material (that is, outcome-dispositive) facts are in dispute, and Defendants have established that they are entitled to judgment as a matter of law. Even viewing the record in the light most favorable to Plaintiff, the Court is satisfied that no reasonable trier of fact could conclude that Dr. Chess was personally involved in any of the contested disciplinary proceedings against Plaintiff, that he was denied due process in connection with those disciplinary proceedings, or that he was punished rather than treated for his serious mental illness. Defendant Chess did not act with deliberate indifference to Plaintiff's mental health needs, or otherwise violate his constitutional rights.

### A. Plaintiff's Maximum Security Classification and Placement at the Dixon Psychiatric Unit Are Beyond the Purview of this Case.

The issue presented in this case is whether Defendant Chess has punished Plaintiff for his mental illness rather than treating him. Plaintiff may not relitigate either his maximum security classification or his placement at the Dixon Psychiatric Unit under this case number. Those challenges were the central issue in *Boykin v. Dixon Mental Health Services*, Case No. 16 CV 50160 (N.D. Ill.). Plaintiff had a full

and fair opportunity to respond to defendants' summary judgment motion in that matter, but he declined to do so.

Plaintiff is not only a mental health patient, but also a maximum security inmate serving a prison sentence. "The Constitution does not require that prisons be comfortable, and the fact that prison conditions are sometimes harsh is part of the price that convicted individuals . . . must pay for their charged offenses." *Moore v. Lemke*, 2016 WL 4530308, at *5 (N.D. Ill. Aug. 30, 2016) (citations omitted); *see also McCree v. Sherrod*, 408 F. App'x 990, 992 (7th Cir. 2011) (non-precedential opinion) ("Routine discomfort is part of the penalty that prisoners pay for their offenses against society") (citing *Rhodes v. Chapman,* 452 U.S. 337, 347 (1981)). One of the essential purposes of imprisonment is to punish. *See, e.g., Kansas v. Hendricks*, 521 U.S. 346, 379 (1997) (Breyer, concurring).

As discussed at length in the Court's summary judgment opinion in Case No. 16 CV 50160: (1) health care providers do not have the power to dictate a prisoner's housing assignment; rather, they can only offer their input, with the final decision made by correctional officials; (2) Plaintiff settled with IDOC administrative officials—the only individuals with the authority to order a transfer; (3) Plaintiff has no constitutionally protected interest in choosing his place of confinement; (4) Plaintiff has no protected interest in his security designation; (5) Plaintiff's serious mental illness necessitates his assignment to a residential treatment unit; (6) Dixon's Psychiatric Unit is the only residential treatment center at which Plaintiff is eligible

for placement; (7) the general conditions of Plaintiff's confinement at the Dixon Psychiatric Unit do not violate his constitutional rights, even if they are harsh and restrictive; and (8) Plaintiff is afforded regular review of his housing placement. *See Boykin*, No. 16 CV 50160, 2019 WL 6117580, Memorandum Opinion and Order entered November 18, 2019.

For all of those same reasons, Defendant Chess is entitled to summary judgment with respect to Plaintiff's dissatisfaction with his security classification and institutional placement. A mere disagreement with a doctor's medical judgment does not constitute deliberate indifference. *Estelle v. Gamble*, 429 U.S. 97, 106 (1976); *Berry v. Peterman*, 604 F.3d 435, 441 (7th Cir. 2010). "[A] medical professional is entitled to deference in treatment decisions unless no minimally competent professional would have so responded under those circumstances." *Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011) (quoting *Sain v. Wood,* 512 F.3d 886, 894-95 (7th Cir. 2008)).

Here, Defendant Chess does not dispute either that she served on Dixon's Admission Review Committee, or that she played a role with her colleagues in evaluating and recommending Plaintiff's placement. But the ultimate decision was not Dr. Chess's to make, and Plaintiff has shown only that he disagrees with her professional assessment. Dr. Chess's considered opinion is a classic example of a matter of medical judgment. Neither Plaintiff's difference of opinion with that assessment nor anything else in the record supports an inference that Dr. Chess's

considered appraisal amounted to "such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Roe v. Elyea*, 631 F.3d 843, 895 (7th Cir. 2011) (citation and internal quotation marks omitted). Plaintiff has no tenable claim against Dr. Chess relating to either his maximum security classification or the decision to place him in Dixon Correctional Center's Psychiatric Unit.

Similarly, Plaintiff may not re-litigate under this case number his claim that he is not receiving proper psychotropic medications for his conditions. The doctrine of collateral estoppel, or issue preclusion, prevents the relitigation of issues resolved in earlier causes of action. *Johnson v. Oystacher*, 2019 WL 4749913, at *4 (N.D. Ill. Sept. 30, 2019) (citing *State Bldg. Venture v. O'Donnell*, 940 N.E.2d 1122, 1127 (Ill. 2010)). For collateral estoppel to apply under Illinois law, the following three requirements must be met: (1) the issue decided in the prior adjudication is identical with the one presented in the suit in question, (2) there was a final judgment on the merits in the prior adjudication, and (3) the party against whom estoppel is asserted was a party or in privity with a party to the prior adjudication. *Brengettcy v. Horton*, 423 F.3d 674, 683 (7th Cir. 2005) (citation omitted); *Johnson*, 2019 WL 4749913, at *4 (same) (citing *O'Donnell*, 940 N.E.2d at 1127).

The Court already ruled in Case No. 16 CV 50160 that Plaintiff's psychiatrists have provided medically appropriate mental health treatment. Plaintiff cannot now

make an end-run around that judgment by suing a psychologist who is not even responsible for prescribing his medications. The Court will not revisit Plaintiff's claims that the medications he receives are generally inappropriate or ineffective, or that crushing pills to avoid hoarding somehow "dilutes" their efficacy. (*See* R. 117, Plaintiff's Affidavit, ¶ 5.)

## B. Dr. Chess Was Not Involved in Any Disciplinary Action Taken Against Plaintiff

The record does not support a finding that Defendant Chess had any direct, personal involvement any time Plaintiff was disciplined for acts of self-harm. Section 1983 is premised on the wrongdoer's personal responsibility; therefore, an individual cannot be held liable in a civil rights action unless he caused or participated in an alleged constitutional deprivation. *Kuhn v. Goodlow*, 678 F.3d 552, 556 (7th Cir. 2012) (citations omitted). The doctrine of *respondeat superior* (blanket supervisory liability) does not apply to actions filed under 42 U.S.C. § 1983. *See, e.g., Kinslow v. Pullara,* 538 F.3d 687, 692 (7th Cir. 2008). To be held liable under 42 U.S.C. § 1983, supervisors "must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see." *T.E. v. Grindle*, 599 F.3d 583, 588 (7th Cir. 2010) (quoting *Jones v. City of Chicago*, 856 F.2d 985, 992 (7th Cir. 1988)). In short, some causal connection or affirmative link between the action complained about and the official sued is necessary for § 1983 recovery. *Arnett v. Webster*, 658 F.3d 742, 757 (7th Cir. 2011) (citations omitted).

Dr. Chess has submitted an affidavit denying involvement in all of the disciplinary proceedings at issue in this case, and denying that she has the authority either to determine guilt or administer punishment. Other members of the prison's mental health staff, not Dr. Chess, played a role in the various disciplinary matters. Plaintiff's repeated argument that Dr. Chess is generally responsible for everything that goes on at Dixon is insufficient to rebut her declaration. Dr. Chess is entitled to judgment as a matter of law on this claim.

### C. There Is No Question for the Jury as to Whether Plaintiff Was Punished for His Suicidal Ideations

Even assuming (without finding) that Dr. Chess was involved with the challenged disciplinary actions, the record does not support a finding that Plaintiff was punished for his mental illness, as opposed to his misconduct.

Plaintiff was not constitutionally entitled to the procedural due process requirements of *Wolff v. McDonnell,* 418 U.S. 539 (1974) and its progeny in the absence of the imposition of "atypical and significant hardship . . . in relation to the ordinary incidents of prison life." *Sandin v. Connor*, 515 U.S. 472, 484 (1995); *Hardaway v. Meyerhoff*, 734 F.3d 740, 743 (7th Cir. 2013) (same). Plaintiff's punishments ranged from verbal reprimands to short-term demotions to C-grade status, brief stints in segregation, the temporary loss of yard privileges, and restrictions on contact visits from outside loved ones. Such minor punishments "rarely give rise to a prisoner's liberty interest, at least in the absence of exceptionally harsh conditions." *Hardaway v. Meyerhoff*, 734 F.3d 740, 743 (7th Cir. 2013).

28

Plaintiff does not describe significant or atypical hardships; in any event, he does not allege a denial of procedural due process. The sole question before the Court is whether the disciplinary action taken against Plaintiff was substantively unreasonable. The Court finds that it was not.

Plaintiff's acknowledged serious mental illness neither entitles him to flout prison rules nor insulates him from prison disciplinary action. Each time Plaintiff faced disciplinary action, the Therapeutic Services Department and/or an individual mental health care professional conducted a mental health evaluation and specifically advised the disciplinary hearing committee that Plaintiff was responsible for his actions. Plaintiff has provided no basis for second-guessing the determination by mental health professionals that he had the necessary *mens rea* to be punished for destructive acts. Prison officials have the discretion to impose administrative punishment for misconduct despite Plaintiff's confinement in a residential treatment setting. No reasonable juror could find that Plaintiff's mental health issues rendered him constitutionally incapable of complying with prison rules when medical experts determined otherwise.

### D. Dr. Chess Did Not Act with Deliberate Indifference to Plaintiff's Suicide Attempts

The record does not support a finding that Defendant Chess responded inappropriately to Plaintiff's mental health crises. "Deliberate indifference to a risk of suicide is present when an official is subjectively 'aware of the significant likelihood that an inmate may imminently seek to take his own life' yet 'fail[s] to take reasonable

29

steps to prevent the inmate from performing the act.'" *Pittman ex rel. Hamilton v. Cty. of Madison, Ill.*, 746 F.3d 766, 775-76 (7th Cir. 2014) (quoting *Collins v. Seeman*, 462 F.3d 757, 761 (7th Cir. 2006)).

Here, Dr. Chess was evidently personally involved in only one incident where Plaintiff was placed on crisis watch in May 2016. The record reflects that Dr. Chess discussed Plaintiff's status with another member of the mental health team and changed his observation status from checks every 10 minutes to 30-minute intervals. Furthermore, Plaintiff continued to see mental health care providers in the following days.

Dr. Chess's action in no way manifests deliberate indifference to Plaintiff's health or safety. *Compare Conner v. Rubin-Asch*, 2019 WL 5690626, at *2 (7th Cir. Nov. 4, 2019) (unpublished opinion) (ruling that a reasonable jury could not find that prison psychologist disregarded a known, substantial risk of harm because defendant made a "reasoned decision" to release plaintiff from clinical observation as safe and the best choice for his mental health needs because the psychologist did not believe that plaintiff's threats and attempts at self-harm were genuine); *Kupsky v. McLaren*, 748 F. App'x 74, 76 (7th Cir. 2019) (unpublished opinion) (complaint failed to state a claim against prison medical staff where plaintiff, by his own admission, stated that they placed him on observation status "multiple times" upon his threats of self-harm because "the Eighth Amendment requires only that the defendants take reasonable steps….") (citation omitted); *Payette v. Dickman*, 394 F. App'x 297 (7th Cir. 2010)

(unpublished opinion) (affirming jury verdict in favor of correctional officials on deliberate indifference claim where they followed the recommendations of mental health professionals for isolation and suicide watch, arranged for medical care after inmate's suicide attempts, and scheduled inmate to meet with mental health staff at regular appointments). No reasonable jury could find against Dr. Chess on Plaintiff's deliberate indifference claim.

### E. Wexford Health Sources Cannot Be Held Liable in View of the Court's Finding in Favor of Dr. Chess

Because Plaintiff has no triable cause of action against Dr. Chess, Wexford Health Sources is likewise entitled to judgment as a matter of law. In order to have a viable claim against Wexford, Plaintiff would have to submit evidence that he suffered a constitutional violation caused by an express or *de facto* Wexford policy that Dr. Chess implemented. *Holman v. Tilden*, --- F. App'x ---, 2019 WL 6324178, at *3 (7th Cir. Nov. 26, 2019); *see also Shields v. Ill. Dep't of Corr.*, 746 F.3d 782, 789 (7th Cir. 2014) ("[Wexford] cannot be held liable under § 1983 unless the constitutional violation was caused by an unconstitutional policy or custom of the corporation itself. *Respondeat superior* liability does not apply to private corporations under § 1983.").

In the instant case, no reasonable jury could return a verdict against Dr. Chess. Accordingly, Wexford cannot be held liable. *Holman*, 2019 WL 6324178, at *3 (citing *Pyles v. Fahim*, 771 F.3d 403, 412 (7th Cir. 2014)); *accord, Coleman v. Ghosh*, 609 F. App'x 871, 873 (7th Cir. 2015) ("because [the plaintiff] did not present evidence of an

underlying constitutional violation, the district court correctly concluded that Wexford cannot be liable for deliberate indifference").   In the absence of individual liability, the Court grants summary judgment in Wexford's favor.

### F.    The IDOC Defendants Fulfilled their Settlement Obligation

Finally, Plaintiff's motion to compel and for sanctions against the IDOC Defendants is denied as moot.   Although Plaintiff reported that he had not yet received a settlement check, his motion apparently crossed in the mail with his payment.   The IDOC Defendants confirmed in *Boykin v. Dixon Mental Health Services*, Case No. 16 CV 50160 (N.D. Ill.), that the Illinois Comptroller issued payment on November 27, 2019.   *See* Case No. 16 CV 50160, R. 192, IDOC Defendants' Response to Plaintiff's Motion to Withdrawal from Settlement Agreement.   Thus, Plaintiff's concerns about nonpayment of the global settlement agreement are now moot.

## VII.  Conclusion

For all of the foregoing reasons, the Court grants Defendants' motion for summary judgment [R. 100].   There is no genuine dispute as to any material fact, and Defendants have established that they are entitled to judgment as a matter of law.   Defendants have shown that Plaintiff was punished for misconduct, and that his serious mental illness did render him incapable of following prison rules. Defendants have further demonstrated that the Psychiatric Unit's mental health staff responded appropriately to mental health crises, threats of self-harm, and acts

of self-harm. Plaintiff has failed to meet his burden of showing that there is a question for the jury as to whether Dr. Chess (or any of her colleagues) have acted with deliberate indifference to Plaintiff's medical and mental health needs.

The Court directs the Clerk to enter final judgment in favor of Defendants. Civil case closed. The Court once again reminds Plaintiff that he is foreclosed from filing a notice of appeal because the U.S. Court of Appeals for the Seventh Circuit has barred him from filing any new lawsuits or appeals. *See Boykin v. Baldwin*, App. No. 18-3346, Order of January 25, 2019 (7th Cir.) (instructing "the clerks of all federal courts in this circuit [to] return unfiled any papers submitted either directly or indirectly by [Mr. Boykin] or on his behalf"); *Boykin v. Fischer*, App. No. 19-3475, Order of January 13, 2020 (7th Cir.) (dismissing, pursuant to that filing restriction, an appeal improperly filed with Clerk of the Court of Appeals). Plaintiff's motions to compel [R. 122] and for leave to appeal *in forma pauperis* [R. 123], as well as his request for a status hearing [R. 130] concerning the status of the summary judgment motion, are denied as moot.

ENTERED:

_____

Honorable Thomas M. Durkin
United States District Judge

Dated: January 27, 2020